**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JERRY BEEMAN AND PHARMACY
SERVICES, INC., doing business as
Beemans Pharmacy; ANTHONY
HUTCHINSON AND ROCIDA INC, doing
business as Finleys Rexall Drug;
CHARLES MILLER, doing business as
Yucaipai Valley Pharmacy; JIM
MORISOLI AND AMERICAN SURGICAL
PHARMACY INC, doing business as
American Surgical Pharmacy; BILL
PEARSON AND PEARSON AND HOUSE,
on behalf of themselves and all
others similarly situated and on
behalf of the general public; doing          No. 07-56692
business as Pearson Medical
Group Pharmacy,                                  D.C. No.
                                             CV-04-00407-VAP
              *Plaintiffs-Appellees,*

                    v.

ANTHEM PRESCRIPTION
MANAGEMENT, LLC; ARGUS HEALTH
SYSTEMS, INC.; BENESCRIPT
SERVICES, INC.; FFI RX MANAGED
CARE; FIRST HEALTH SERVICES
CORPORATION; MANAGED PHARMACY
BENEFITS, INC., formerly known as
Cardinal Health MPB Inc.;
NATIONAL MEDICAL HEALTH CARD
SYSTEMS, INC.; PHARMACARE
MANAGEMENT SERVICES, INC.;

9723

PRIME THERAPEUTICS; RESTAT
CORPORATION; RX SOLUTIONS, INC.;
TMESYS, INC.; WHP HEALTH
INITIATIVES, INC.; MEDE AMERICA
CORP.,
            *Defendants-Appellants.*

JERRY BEEMAN AND PHARMACY
SERVICES, INC., doing business as
Beemans Pharmacy; ANTHONY
HUTCHINSON AND ROCIDA INC, doing
business as Finleys Rexall Drug;
CHARLES MILLER, doing business as
Yucaipai Valley Pharmacy; JIM
MORISOLI AND AMERICAN SURGICAL
PHARMACY INC, doing business as
American Surgical Pharmacy; BILL
PEARSON AND PEARSON AND HOUSE,
on behalf of themselves and all
others similarly situated and on
behalf of the general public; doing
business as Pearson Medical
Group Pharmacy,
            *Plaintiffs-Appellees,*

v.

TDI MANAGED CARE SERVICES,
INC., doing business as ECKERD
HEALTH SERVICES; MEDCO HEALTH
SOLUTIONS, INC.; EXPRESS SCRIPTS,
INC.; ADVANCE PCS, Advance PCS
Health, L.P.; RX SOLUTIONS, INC.,
            *Defendants-Appellants.*

No. 07-56693

D.C. No.
CV-02-01327-VAP

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted
March 8, 2011—Pasadena, California

Filed July 19, 2011

Before: Betty B. Fletcher, Stephen Reinhardt, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge B. Fletcher;
Dissent by Judge Wardlaw

## COUNSEL

Thomas M. Peterson (argued), Morgan Lewis & Bockius, LLP, San Francisco, California, for the defendants-appellants.

Michael A. Bowse (argued), Browne Woods George LLP, Los Angeles, California, for the plaintiffs-appellees.

## OPINION

B. FLETCHER, Circuit Judge:

In this consolidated appeal, defendants-appellants (collectively "Defendants") appeal the denial by the district court of

their motions for judgment on the pleadings. Plaintiffs-appellees (collectively "Plaintiffs") brought this diversity suit against Defendants to enforce California Civil Code §§ 2527 and 2528. These statutes require Defendants to supply the results of bi-annual studies of California pharmacies' retail drug pricing for private uninsured customers to their clients, who are third-party payors such as insurance companies and self-insured employer groups. In their motions for judgment, Defendants argued that California Civil Code § 2527 (hereinafter "§ 2527") compels speech in violation of the United States and California Constitutions. The district court denied the motions, first reasoning that it was not bound by the state appellate court decisions striking down the statute under the California Constitution, and then holding that § 2527 does not unconstitutionally compel speech. Defendants obtained permission to file an interlocutory appeal. We accordingly have jurisdiction under 28 U.S.C. § 1292(b).

In this appeal, we must decide (1) whether we are bound by the *Erie* doctrine to follow the state appellate court decisions striking down § 2527, and, if not, (2) whether § 2527 violates the First Amendment or the California Constitution's free speech provision. We conclude that *Erie* does not require us to follow the state appellate court decisions, and that § 2527 does not unconstitutionally compel speech under either the United States or California Constitution. We therefore affirm.

## I.

### A.   Factual Background

Plaintiffs own five independent retail pharmacies licensed in California. Defendants are current or former pharmacy benefit managers ("PBMs"). They "contract with third-party payors or health plan administrators such as insurers, HMOs, governmental entities, and employer groups to facilitate cost-effective delivery of prescription drugs to health plan members or other persons to whom the third-party payors provide

prescription drug benefits." PBMs assist in the "processing of prepaid or insured prescription drug benefit claims submitted by a licensed California pharmacy or patron thereof." In other words, PBMs act as intermediaries between pharmacies and third-party payors such as health insurance companies. Pursuant to this role, PBMs may create networks of retail pharmacies that agree to accept certain reimbursement rates when they fill prescriptions for health plan members. According to Defendants, network reimbursements "generally are lower than what pharmacies would charge uninsured, cash-paying customers."

Section 2527, the challenged statute, requires "prescription drug claims processors"[1] to conduct or obtain studies every 24 months identifying the fees California pharmacies charge to private customers for pharmaceutical dispensing services. Cal. Civ. Code § 2527(c).[2] The claims processors must send the

---

[1]Although Defendants maintain that they are not "prescription drug claims processors" under the statute, the issue is not contested for purposes of this appeal.

[2]California Civil Code § 2527(c) reads:

> On or before January 1, 1984, every prescription drug claims processor shall have conducted or obtained the results of a study or studies which identifies the fees, separate from ingredient costs, of all, or of a statistically significant sample, of California pharmacies, for pharmaceutical dispensing services to private consumers. The study or studies shall meet reasonable professional standards of the statistical profession. The determination of the pharmacy's fee made for purposes of the study or studies shall be computed by reviewing a sample of the pharmacy's usual charges for a random or other representative sample of commonly prescribed drug products, subtracting the average wholesale price of drug ingredients, and averaging the resulting fees by dividing the aggregate of the fees by the number of prescriptions reviewed. A study report shall include a preface, an explanatory summary of the results and findings including a comparison of the fees of California pharmacies by setting forth the mean fee and standard deviation, the range of fees and fee percentiles (10th, 20th, 30th, 40th, 50th, 60th, 70th, 80th, 90th). This study or these studies shall be conducted or obtained no less of ten than every 24 months.

Cal. Civ. Code § 2527(c).

results of these studies to "each client for whom [they] perform[ ] claims processing services," or, in other words, to third party payors such as insurers. *Id.* § 2527(d).[3] Section 2528 imposes civil penalties ranging from $1,000 to $10,000 for violations of § 2527. Cal. Civ. Code § 2528.

The legislative history of § 2527 reveals that the original bill, introduced by the California Pharmacists Association in 1981, required pharmacies to be reimbursed according to their "customary charges" rather than according to rates "unilaterally set by PBMs." *Beeman v. TDI Managed Care Services, Inc.*, 449 F.3d 1035, 1038 (9th Cir. 2006) ("*TDI Managed Care*"). The bill was then amended in committee to substitute the reimbursement requirements with the current PBM reporting requirements. According to legislative staff comments, the "purpose of this [amended] bill is to require claims processors to present objective data on the range and percentiles of usual and customary charges of pharmacists in the hope that at a time in the future this information will become the basis for reimbursement." In recommending that the Governor sign the bill, California's Department of Insurance advised that § 2527 "is fairly innocuous in its impact, since it merely requires a study to be made and distributed to clients, and does not require any action to be taken on the basis of that study." The Department further noted that the statute could "help identify areas for cost-containment in the future."

---

[3]California Civil Code § 2527(d) reads:

> The study report or reports obtained pursuant to subdivision (c) shall be transmitted by certified mail by each prescription drug claims processor to the chief executive officer or designee, of each client for whom it performs claims processing services. Consistent with subdivision (c), the processor shall transmit the study or studies to clients no less often than every 24 months.

Cal. Civ. Code § 2527(d).

## B.   Procedural Background

In 2002, Plaintiffs filed a class action complaint in the Central District of California (*Beeman* 02) alleging, *inter alia*, that Defendants failed to conduct the fee studies mandated by § 2527(c). In 2004, Plaintiffs filed a second complaint (*Beeman* 04) alleging the same violation against a second group of Defendants. Both cases were assigned to Judge Virginia Phillips, but have not been consolidated. The district court has diversity jurisdiction over both cases pursuant to 28 U.S.C. § 1332.[4]

The district court granted Defendants' motions to dismiss both cases, concluding that Plaintiffs lacked an injury-in-fact sufficient to confer Article III standing. *See TDI Managed Care*, 449 F.3d at 1038. The district court found it unnecessary to reach Defendants' alternative grounds for seeking dismissal, including that § 2527 violated their right to free speech under the United States and California Constitutions. Plaintiffs appealed.

While the appeal of the district court's standing decision was pending in this court, three of the five Plaintiffs filed suit against some but not all of the *Beeman* 02 and *Beeman* 04 Defendants in Los Angeles County Superior Court. Like the federal actions, that suit alleged that Defendants failed to comply with the requirements of § 2527. In *Bradley v. First Health Services Corp.*, No. B185672, 2007 WL 602969 (Cal.

---

[4]In their Complaints, Plaintiffs allege violations of only state law. Defendants aver that § 2527 violates the United States Constitution as an affirmative defense to Plaintiffs' allegations. Under the well-pleaded complaint rule, therefore, there is no federal question jurisdiction, and the district court's jurisdiction is based solely on diversity of citizenship. *See Vaden v. Discover Bank*, 129 S. Ct. 1262, 1272 (2009) ("Under the long-standing well-pleaded complaint rule, however, a suit arises under federal law only when the plaintiff's statement of his own cause of action shows that it is based upon federal law." (internal citations, quotation marks, and alternations omitted)).

Ct. App. Feb. 28, 2007), the California Court of Appeal affirmed the state trial court's dismissal of the suit, declaring § 2527 unconstitutional under article I, section 2 of the California Constitution. The Supreme Court of California denied review on June 13, 2007.

Meanwhile, in *TDI Managed Care*, 449 F.3d at 1040, we overturned the district court's standing decisions in *Beeman* 02 and *Beeman* 04 and remanded the case for further proceedings. We did not reach Defendants' argument that § 2527 is unconstitutional because the issue was not fully argued before the district court. *Id.*

On remand, the Defendants moved for judgment on the pleadings in *Beeman* 02 and *Beeman* 04, arguing that § 2527 unconstitutionally compels speech in violation of both the United States and California Constitutions. The Defendants cited three California state appellate court decisions, including *Bradley*, all of which held that § 2527 violates the California Constitution's free speech provision. The district court denied the motions for judgment, reasoning that, under the *Erie* doctrine, it was not bound by the California appellate court decisions because (1) the single published state court decision relied entirely on interpretations of federal, not state, law; and (2) there was persuasive evidence that the Supreme Court of California would not follow the state appellate courts' holding. The district court accordingly conducted its own constitutional analysis and held that § 2527 does not compel speech in violation of the First Amendment or the California Constitution's free speech provision. The district court then granted Defendants' requests to file a petition for interlocutory appeal. Defendants in *Beeman* 02 and *Beeman* 04 successfully petitioned this court for permission to appeal under 28 U.S.C. § 1292(b), and the cases were consolidated into the current appeal.

Since this appeal was filed, the district court has granted in part Defendants' motions for summary judgment based on res

judicata. The court held that the three Plaintiffs who brought suit in *Bradley* are precluded by the final judgment in that case from pursuing their overlapping claims in federal court. The district court further held, however, that the Plaintiffs who were not parties in that state court suit are not so precluded, and can continue to pursue their federal action. On February 25, 2008, we stayed the district court proceedings pending our decision in this appeal.

## II.

"In an interlocutory appeal, we review de novo the district court's denial of a motion for judgment on the pleadings." *Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc.*, 423 F.3d 1056, 1063 (9th Cir. 2005). Here, we must decide whether Defendants' motions for judgment should have been granted on the ground that § 2527 violates either the United States or California Constitution.

## A.  *Erie* Doctrine

[1] We first determine whether, in exercising diversity jurisdiction over this case, we are bound by the California state appellate courts' holdings that § 2527 is unconstitutional under the California Constitution's free speech provision. The seminal case of *Erie Railway Co. v. Tomkins*, 304 U.S. 64, 71-80 (1938), held that federal courts exercising diversity jurisdiction must apply as their rules of decision the substantive law of the states. Generally, state law is determined by statutes or by pronouncements from the state's highest court. *See West v. American Telegraph & Telephone Co.*, 311 U.S. 223, 236-37 (1940); *Vestar Dev. II, LLC v. General Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001). In cases where a state supreme court has not addressed the presented issue of state law, "a federal court is obligated to follow the decisions of the state's intermediate appellate courts" unless the court finds "convincing evidence that the state's supreme court likely would not follow [them]." *Ryman v. Sears, Roebuck*

*and Co.*, 505 F.3d 993, 994 (9th Cir. 2007) (internal quotation marks and citations omitted). As the inquiry is one purely of law, we determine de novo whether *Erie* requires us to follow the reasoning of the state appellate courts on the issue of § 2527's constitutionality.

Three California appellate court decisions have concluded that § 2527 violates the free speech clause of the California Constitution. The first of these decisions, *ARP Pharmacy Servs. Inc. v. Gallagher Bassett Servs., Inc.*, 42 Cal. Rptr. 3d 256 (Cal. Ct. App. 2006), is set forth in a published opinion. The two subsequent decisions—*A.A.M. Health Group, Inc. v. Argus Health Systems, Inc.*, No. B183468, 2007 WL 602968 (Cal. Ct. App. Feb. 28, 2007) and *Bradley*—decided on the same day, relied heavily on *ARP* and remain unpublished. All three decisions came out of California's second appellate district; none of the state's five other appellate districts has opined on the issue.

The district court, in concluding that it was not bound by the state appellate court holdings, considered only the *ARP* decision. It declined to consider the two unpublished decisions, citing California Rule of Court 977(a).[5] Defendants correctly argue that we are not precluded from considering these unpublished decisions as a possible reflection of California law, although they have no precedential value. *See Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003). Therefore, we consider all three California appellate court decisions in our analysis.

---

[5]California Rule of Court 977(a) reads: "[Unpublished opinions] An opinion of a Court of Appeal or an appellate department of the superior court that is not certified for publication or ordered published shall not be cited or relied on by a court or a party in any other action or proceeding . . . ."

**1.**

**[2]** First, the district court reasoned that it was not bound by the state appellate court decisions because they "rest entirely on interpretations of federal, not state law." It is true that *ARP*, the first state appellate court opinion on the issue of § 2527's constitutionality, "applied legal principles derived exclusively from federal constitutional law." The state court decisions to which *ARP* cites either were similarly decided under the federal Constitution or serve only as duplicate references to analogous federal decisions. Nonetheless, the ultimate conclusion reached in *ARP* is one of state law, not federal law. *See ARP*, 42 Cal. Rptr. 3d at 267 ("We conclude that the reporting requirement in section 2527 and the related penalty and enforcement provisions in section 2528 violate the free speech provision of the California Constitution."). We note that the state court did not apparently reach its conclusion under the First Amendment and then simply extend it to California's free speech provision; its opinion purports to analyze the statute only under article I, section 2 of the California Constitution. Accordingly, the current operative law in the State of California's second appellate district is that § 2527 is unconstitutional under the California Constitution.

**[3]** No authority supports the premise that, when a state court relies primarily on federal cases to reach a conclusion under state law, its decision is exempt from *Erie*. Thus, the state court's exclusive reliance upon and application of federal case law does not automatically allow federal courts to disregard its holding as the substantive law of the state. Pursuant to *Erie*, *ARP*'s holding as to § 2527's constitutionality under the California Constitution's free speech provision is the rule of decision that a federal court sitting in diversity must apply (subject to the "convincing evidence" exception discussed below).[6]

---

[6]*A.A.M. Health* and *Bradley* rely heavily on *ARP*, in addition to federal case law, in reaching the same conclusion. Like *ARP*, those decisions interpret only California's free speech provision, and not the First Amendment.

**2.**

**[4]** The district court alternatively reasoned that, even if *ARP*'s holding was one under state law, "there is convincing evidence that the Supreme Court of California" would not follow them. We agree. We hold that there is convincing evidence that, in assessing the constitutionality of § 2527, the Supreme Court of California would construe article I, section 2 of the California Constitution as coextensive with the First Amendment. Because, as we explain in Part B below, § 2527 does not violate the First Amendment, we believe that the Supreme Court of California would deem § 2527 constitutional under the state constitution as well. Accordingly, we conclude that, in this case, the state supreme court would not follow the holdings of the state appellate courts. *Erie* does not, therefore, require us to apply *ARP*, *A.A.M. Health*, or *Bradley* in deciding whether Defendants' motions should have been granted.

California courts generally "follow the United States Supreme Court in matters concerning free speech doctrine . . . unless persuasive reasons are presented for taking a different course." *Gallo Cattle Co. v. Kawamura*, 159 Cal. App. 4th 948, 959 (2008) (internal citations and quotation marks omitted). California courts have identified and applied "four categories of potential sources of such persuasive reasons":

> (1) something "in the language or history of the California provision suggests that the issue before us should be resolved differently than under the federal Constitution"; (2) "the high court 'hands down a decision which limits rights established by earlier precedent in a manner inconsistent with the spirit of the earlier opinion' "; (3) there are vigorous "dissenting opinions [or] incisive academic criticism of those decisions"; or (4) following the federal rule would "overturn established California doctrine affording greater rights."

*Id.* at 959 (quoting *People v. Teresinski*, 30 Cal. 3d 822, 836-837 (Cal. 1982)); *see Gerawan Farming, Inc. v. Lyons*, 24 Cal. 4th 468, 510-12 (Cal. 2000) (applying these factors).

Considering these limited categories, we find no reason to believe that the California Supreme Court would not, in accordance with its general practice, decide the issue before us by relying primarily, if not exclusively, on First Amendment precedent. The California Supreme Court has interpreted free speech protections under the California Constitution to be "in some ways broader" than those under the First Amendment. *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 958-59 (Cal. 2002). No statutory language, authoritative decision, or California legal doctrine, however, suggests that, to the extent that California's free speech provision can be broader than the First Amendment, such additional breadth operates in the context of compelled speech. *Gerawan*, a recent case in which the California Supreme Court interpreted its Constitution more expansively than the First Amendment, dealt only with the narrow issue of compelled subsidies for commercial speech, rather than compelled speech more broadly.[7] As discussed more fully below, cases dealing with commercial speech and compelled subsidies are of little relevance here.[8] Finally, there

---

[7]Notably, *Gerawan* came down before *United States v. United Foods, Inc.*, 533 U.S. 405 (2001), another commercial speech subsidy decision by the U.S. Supreme Court. *United Foods* approaches and distinguishes prior compelled subsidy cases in a similar manner as does *Gerawan*. Therefore, the distinction between the United States and California Constitutions, even on the narrow subject of subsidies for commercial speech, probably no longer exists after *United Foods* further clarified the scope of First Amendment protection in this area.

[8]*ARP* cites to *Gerawan* only in conjunction with federal precedent and for the general proposition that, "like the First Amendment[ ]," the California Constitution protects against compelled speech. *Gerawan*, 24 Cal. 4th at 491; *ARP*, 42 Cal. Rptr. 3d at 260. *ARP* does not suggest that *Gerawan* serves as independent state authority for its actual holding that § 2527 compels speech in a manner that infringes upon the California Constitution. In fact, *ARP* expressly distinguishes compelled subsidy cases and concludes, as we do, that they are inapposite. *See* 42 Cal. Rptr. 3d at 262.

has been no noteworthy criticism of the First Amendment compelled speech jurisprudence on the basis of which the California Supreme Court would choose to depart from those cases. Thus, we find no persuasive basis on which to assume that the Supreme Court of California would read the state's free speech provision differently or more expansively than the First Amendment in the compelled speech context.

Indeed, none of the state appellate court decisions opining on § 2527's constitutionality even suggests that its holding turns on a more expansive reading of California's free speech provision than of the First Amendment. Instead, these opinions rely exclusively on federal First Amendment doctrine to reach their conclusions. *ARP* mentions the U.S. Supreme Court by name six times, and the key parts of its holdings are expressly based on its purported adoption of federal precedent. *See, e.g.*, *ARP*, 138 Cal. App. 4th at 1314-15 (discussing *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005) and holding that "[*u*]*nder this definition* [of compelled speech], section 2527, which requires drug claims processors to obtain and transmit drug processing cost reports to [their] clients, is properly classified as 'true' compelled speech" (emphasis added)). *A.A.M. Health* is even more explicit on this point. *A.A.M. Health*, 2007 WL 602968, at *3 (assuming for purposes of analyzing *FAIR* that "the freedom of speech in the federal and state constitutions are coextensive"). Although the state appellate courts' application of First Amendment precedent was erroneous, those opinions nonetheless make clear that they are attempting to follow federal law.

It is evident that the California Supreme Court, like the state appellate courts, would analyze the issue of § 2527's constitutionality under article I, section 2 of the California Constitution by following First Amendment doctrine. And because, as discussed below, § 2527 is constitutional under the First Amendment, we believe that the California Supreme

Court would reach the same conclusion under its own constitution.

Conversely, we conclude that the Supreme Court of California would reject the holdings of *ARP*, *A.A.M. Health*, and *Bradley*. Indeed, in analyzing and applying First Amendment law, the state appellate courts committed several critical errors. First, the *ARP* court ignored the Supreme Court's most recent case on compelled speech, *Rumsfeld v. Forum for Academic and Institutional Rights*, 547 U.S. 47 (2006) ("*FAIR*"), in its discussion and application of federal law. Because *FAIR* clarifies the line between compulsion of speech that does and does not infringe upon the First Amendment, its analysis is highly relevant and directly undermines the conclusion reached in *ARP*. Second, the *ARP* court incorrectly interpreted and applied the federal case law that it did cite. Specifically, the opinion fails to recognize the key distinctions between the speech at issue in this case and that in *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781 (1988), a decision on which *ARP* heavily relies. The compelled disclosure in *Riley* had a direct chilling effect on protected First Amendment speech, and it was on this basis that the disclosure was struck down. No such chilling effect exists here.[9]

Citing *ARP* extensively, neither subsequent unpublished state appellate court decision offers any significant analytic support for its conclusion. *Bradley* relies almost exclusively on *ARP*, and does little to fill the gaps in that opinion's reasoning. *A.A.M. Health*, at least, acknowledges the Supreme Court's holding in *FAIR*. 2007 WL 602968, at *3. Nonetheless, *A.A.M. Health* fails to examine or appreciate *FAIR*'s significance, simply concluding without analysis that it does not apply because "section 2527 is not analogous to a law that governs a course of conduct." *Id.* This purported distinction,

---

[9]The state court's errors in applying federal law are more fully discussed in our First Amendment analysis in Part B, below.

however, is based on an overly superficial reading of the *FAIR* decision.

Thus, all three state appellate decisions are fatally flawed in their analysis of federal precedent. These errors provide further evidence that the Supreme Court of California would not reach the same result. *Cf. Briceno*, 555 F.3d at 1080-82 (reasoning that the Supreme Court of California would not adopt state appellate court decisions interpreting a provision of the California Penal Code); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482-83 (9th Cir. 1986) (concluding that the Supreme Court of California would not follow the decision of an appellate court because its analysis was "flawed"); *Owen By and Through Owen v. United States*, 713 F.2d 1461, 1465-66 (9th Cir. 1983) (pointing out "defects" in a state appellate court's interpretations of a California statute governing settlement agreements, and concluding that the California Supreme Court would follow this circuit's interpretation instead).

[5] We are convinced that the California Supreme Court would, consistent with this opinion, rely primarily on (and correctly apply) First Amendment jurisprudence when presented with the question of § 2527's constitutionality under the California Constitution.  And because, as explained below, the statute is constitutional under the First Amendment, the California Supreme Court would not follow the holdings of the state appellate courts, but rather would uphold the statute's constitutionality. *Erie* does not, therefore, require us to apply to this case the state courts' holding that § 2527 is unconstitutional under the California Constitution.[10]

---

[10]Defendants and our dissenting colleague place great weight upon the fact that, after the district court's decision on the motions for judgment on the pleadings, the Supreme Court of California denied Plaintiffs' petition for review of *Bradley.* According to Defendants, the Supreme Court of California's refusal to reject *ARP*, *A.A.M. Health*, and *Bradley* in favor of the district court's constitutional analysis is the best evidence that it would not decide the constitutionality of § 2527 differently from the California appellate courts.

### B.   First Amendment

**[6]** As we are not bound under *Erie* to follow the state appellate decisions, we now independently assess the constitutionality of § 2527. Because the result under both the United States and California Constitutions turns on First Amendment law, we start our analysis there. It is a well-established principle that freedom of speech not only protects the right to speak, but also "prohibits the government from telling people what they must say." *FAIR*, 547 U.S. at 61. "The right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (internal citation and quotation marks omitted). Here, Defendants argue that § 2527's requirements violate their First Amendment right to be free from compelled speech.

### 1.

As a preliminary matter, we must decide whether Defendants mount a facial or an as applied challenge to § 2527.

---

A state's highest court's refusal to grant discretionary review of a lower court decision is not dispositive of whether it agrees with the lower court's holding. *See Ryman*, 505 F.3d at 995 n.2. Indeed, the Supreme Court of California has instructed that its refusal to grant a hearing in a particular case is not to be construed as an affirmative approval of an intermediate appellate court opinion. *See, e.g.*, *In re K F Dairies, Inc. & Affiliates*, 224 F.3d 922, 925 n.3 (9th Cir. 2000) ("The California Supreme Court's denial of our certification request is in no way an expression of its opinion on the correctness of the judgments in those two cases." (citing *Trope v. Katz*, 11 Cal. 4th 274, 287 n.1 (Cal. 1995)). Moreover, in *Bradley*, three of the seven California Supreme Court Justices recused themselves from ruling on the petition for review. Finally, the Supreme Court denied review in *Bradley* after the district court in this case refused to follow the holdings of the state appellate courts. Thus, in declining to review the decision in *Bradley*, the Supreme Court declined not only to reverse the lower courts, but also to affirm them in the face of a contrary federal holding. We therefore decline to give the Supreme Court of California's refusal to hear *Bradley* the significance for which Defendants advocate.

Plaintiffs argue that Defendants' argument is based on nothing more than "the words of the statute," and is therefore a facial challenge. Defendants respond that, because they raise the statute's unconstitutionality in response to Plaintiffs' attempts to enforce the statute against them, this is an as applied challenge.

We conclude that this case presents a facial challenge. The thrust of Defendants' argument is that neither they nor any other PBM should ever have to comply with § 2527's directive because the statute itself unconstitutionally compels speech. *See Doe v. Reed*, 130 S. Ct. 2811, 2817 (2010) (noting that the presented challenge to Washington's election law was " 'facial' in that it [was] not limited to plaintiffs' particular case, but challeng[ed] the application of the law more broadly to all referendum petitions"). Defendants challenge neither the specific manner in which the statute applies to them nor a particular instance of the statute's application. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 300 (1993) (noting that the case involved a facial challenge because the respondents were not challenging the regulation's application in a particular instance). Although they bring their challenge in response to an enforcement action, Defendants are not alleging that the statute is unconstitutional only as applied in the context of Plaintiffs' suit. Rather, if we were to find in Defendants' favor, we would necessarily hold that § 2527 violates the First Amendment whenever and against whomever it is enforced.

Thus, in order to succeed in their facial challenge to § 2527, Defendants must show that "no set of circumstances exists under which the [statute] would be valid." *Reno*, 507 U.S. at 301 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (internal quotation marks omitted). A facial challenge presents a "heavy" burden, and is the "most difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745.

**2.**

Moving to the merits of Defendants' argument, we evaluate the speech compelled by § 2527 in order to determine whether

it infringes on the First Amendment. The Supreme Court first established the Constitution's prohibition on compelled speech in *West Virginia Bd. of Education v. Barnette*, 319 U.S. 624 (1943). There, the Court held unconstitutional a state law compelling students to salute the flag and recite the Pledge of Allegiance in schools. *Id.* at 642. The Court reasoned that "a ceremony so touching matters of opinion and political attitude may [not] be imposed upon the individual by official authority under powers committed to any political organization under our Constitution." *Id.* at 636. The Court again opined on the issue of compelled speech in *Wooley*, 430 U.S. at 714-15. Striking down a New Hampshire law requiring vehicles to bear license plates with the state motto "Live Free or Die," the Court reasoned that "a state measure which forces an individual . . . to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable" invades the sphere protected by the First Amendment. *Id.* Even as broadly construed, therefore, the holdings of both *Barnette* and *Wooley* are limited to compelled speech that affects the content of the speaker's message by touching on matters of opinion, or to compulsions that force the speaker to endorse a particular viewpoint.

In the wake of these seminal decisions, the Court has further developed the doctrine of compelled speech in several specific contexts. As relevant here, *ARP* and Defendants rely heavily on *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781 (1988), to support their argument that, although it compels only facts rather than an express opinion, § 2527 is subject to the highest First Amendment scrutiny. In *Riley*, the Court struck down the North Carolina Charitable Solicitations Act, which required professional fundraisers to disclose to potential donors the gross percentage of revenues retained in prior charitable solicitations. *Id.* at 784-801. As was well-established in the Court's precedent, charitable solicitations "involve a variety of speech interests . . . that are within the protection of the First Amendment." *Id.* at 788.[11]

---

[11]As the Supreme Court has held, "charitable appeals for funds . . . involve a variety of speech interests — communication of information, the

The Court reasoned that the "predictable result" of the compelled disclosure at issue would be to discourage fundraisers from "engaging in solicitations that result in an unfavorable disclosure." *Id*. at 800. The Court therefore concluded that this law was subject to "exacting First Amendment scrutiny" and that its prophylactic rule applicable to all professional solicitations was not "narrowly tailored" to the State's interest in full disclosure. *Id*. at 798-801. The *Riley* Court's reasoning was thus consistent with the Court's earlier precedent applying strict First Amendment scrutiny to statutes regulating charitable solicitations. *See id.* at 796.

**[7]** Notably, then, under *Riley*, compelled disclosures of fact, like compelled matters of opinion, *may* infringe upon the First Amendment. But the decision there turned on the Court's finding that the compelled disclosure at issue had a direct and chilling effect on speech that was otherwise cloaked in First Amendment protection—charitable solicitations. Contrary to the Dissent's analysis, *Riley*, in deciding to apply First Amendment scrutiny to the compelled disclosures, expressly reasons that *Wooley* and *Barnette* could not be distinguished on the grounds that they involved compelled opinion as opposed to compelled fact, because "either form of compulsion *burdens protected speech*." *Riley*, 487 U.S. at 797-98 (emphasis added); *see also id.* at 798 (noting other examples of compelled factual disclosures that would "clearly and substantially burden protected speech"). The burden placed on protected speech, therefore, is precisely why *Riley*'s holding with respect to compelled facts is consistent with the content-based compulsion of speech doctrine established by

---

dissemination and propagation of views and ideas, and the advocacy of causes — that are within the protection of the First Amendment." *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980). Such appeals are inextricably "intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues," because "without solicitation the flow of such information and advocacy would likely cease." *Id.*

*Wooley* and *Barnette*. By chilling protected speech, the compelled disclosure "necessarily alter[ed] the content of the speech." *Id.* at 795. Thus, although it required only the disclosure of factual information, the statute at issue in *Riley* nonetheless altered the speaker's message and thereby constituted a content-based regulation subject to "exacting" First Amendment scrutiny.

Recently, the Court further clarified the line between content-based compulsion of speech that infringes upon the First Amendment (as in *Barnette* and *Wooley*), and that which does not. In *FAIR*, 547 U.S. at 60-65, the Supreme Court upheld against a First Amendment challenge the constitutionality of the Solomon Amendment, which withholds federal funding from colleges and universities that deny equal access to military and nonmilitary recruiters. *FAIR* recognizes that, in providing recruiting assistance to the military pursuant to the statute, schools may be compelled to provide "statements of fact" in the form of notices or emails. *Id.* at 61-62. *FAIR* recognized that compelled factual statements, like compelled statements of opinion, may affect the content of the speaker's message and thereby trigger First Amendment scrutiny. *Id.* at 62 (citing *Riley*, 487 U.S. at 797-98). The Court, however, declined to apply any such scrutiny, expressly distinguishing the speech compelled by the Solomon Amendment from that in *Barnette* and *Wooley*. *Id.* As the Court noted, the Solomon Amendment does not "dictate the content of speech at all" and does not involve a "Government-mandated pledge or motto that the school must endorse." *Id.* Its requirements, therefore, did not warrant constitutional scrutiny.

**[8]** Consistent with *Barnette*, *Wooley*, and *Riley*, *FAIR* makes clear that not all fact-based disclosure requirements are subject to First Amendment scrutiny.[12] Instead, such require-

---

[12]We readily acknowledge, as both *FAIR* and our dissenting colleague point out, that compelled disclosures are not immune from First Amendment scrutiny *merely* because they involve facts rather than opinions. *See*

ments implicate the First Amendment only if they affect the content of the message or speech by forcing the speaker to endorse a particular viewpoint or by chilling or burdening a message that the speaker would otherwise choose to make.

[9] We now apply this precedent to the statute at issue here. Defendants argue that § 2527 constitutes a content-based compulsion of speech because it forces PBMs to advocate for pharmacies "in the hope that the insurance companies will provide greater remuneration to [them]." This argument, however, significantly mischaracterizes the nature of § 2527's requirement. The statute requires PBMs merely to conduct or obtain the results of studies of the prices charged by pharmacies to their private customers and to report the objective data revealed by these studies to the third-party health plan managers for whom they process claims. The "compelled speech" at issue, therefore, is nothing more than the reporting of the purely statistical facts that these studies yield. The statute does not in any way regulate the *content* of the speech—content is instead dictated solely by the results of the studies themselves. *See id.* at 57 (noting that the Solomon Amendment does not focus on the content of the school's recruiting policy, but only on results achieved by the policy).

[10] Like the speech in *FAIR*, the compelled speech here does not in any way resemble the type of political messages

---

*FAIR*, 547 U.S. at 62. But *FAIR* makes clear that the inquiry requires an additional step: whether a compelled factual disclosure requires First Amendment scrutiny depends on whether it involves anything like the "Government-mandated pledge or motto" at issue in *Barnette* and *Wooley*. *Id.* The *FAIR* Court reasoned that "[c]ompelling a law school that sends scheduling e-mails for other recruiters to send one for a military recruiter is simply not the same as forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto 'Live Free or Die,' and it trivializes the freedom protected in *Barnette* and *Wooley* to suggest that it is." *Id.* Our own precedent is entirely consistent with this point. *See Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 848-51 (9th Cir. 2003).

at issue in *Barnette* and *Wooley*. Nothing in the statutory scheme forces the PBMs to advocate any position or "endorse" any "pledge or motto" that is contrary to their beliefs. *See FAIR*, 547 U.S. at 62. In fact, § 2527 does not require Defendants to convey any "message" at all; Defendants are not compelled to convey a viewpoint or perform any subjective analysis of the numbers they report.[13] Instead, § 2527 requires only a purely objective, informational exercise, the results of which PBMs must report to their clients.[14]

We note that Defendants' and the state appellate courts' repeated emphasis on the purpose for which § 2527 was enacted—in hopes that the reported pricing information could serve as the basis for future increases in pharmacy reimbursements—is of limited significance. That the legislation was motivated by political considerations does not mean that the obligations that it places on the speaker are, in fact, political or ideological in nature.[15] Indeed, nearly every piece of pro-

---

[13]The statute does require, in addition to the data, "a preface, an explanatory summary of the results and findings including a comparison of the fees of California pharmacies by setting forth the mean fee and standard deviation, the range of fees and fee percentiles (10th, 20th, 30th, 40th, 50th, 60th, 70th, 80th, 90th)." Cal. Civ. Code § 2527(c). This analysis, however, is entirely objective, and does not carry with it a particular message or viewpoint.

[14]The Dissent argues that our "interpretation of the First Amendment contradicts decades of Supreme Court precedent extending constitutional protection to communications containing truthful information." But this assertion misapprehends our position. We agree, of course, that the government may not *prohibit* speakers from disseminating facts. The cases that the Dissent cites all make this basic point. For the government to *compel* factual speech, however, is quite different from its *prohibiting* factual speech. This case deals only with the former. *See Riley*, 487 U.S. at 796 (noting that "[t]here is certainly some difference between compelled speech and compelled silence" but recognizing that the difference has no constitutional significance *when protected expression is affected*).

[15]As was noted in *ARP*, the purpose of the enacted bill may have been for the benefit not only of pharmacies, but also insurers and insured consumers. *See ARP*, 42 Cal. Rptr. 3d at 265 (discussing the purpose of

posed and enacted legislation is generated by some sort of political motive. Our inquiry, however, is limited to whether the requirements contained *within the enacted text* infringe on the First Amendment.[16] We conclude that they do not.

Furthermore, in contrast to the factual reporting requirement in *Riley*, the pricing study results compelled by § 2527 in no way alter, chill, or otherwise affect a PBM message that enjoys First Amendment protection. Whereas the law in *Riley* threatened to interfere with core protected speech, by "hamper[ing] the legitimate efforts of professional fundraisers to raise money for the charities they represent," 487 U.S. at 799, § 2527 does not in any way burden a PBM's ability to say whatever it chooses about pharmacy reimbursements. *Cf. FAIR*, 547 U.S. at 60 (noting that "[l]aw schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy"). If, for example, a PBM wanted actively to engage in lobbying efforts to directly discourage its clients from increasing reimbursements to pharmacies, its simultaneous compliance with § 2527 would in no way chill or impede this message. Indeed, it is quite possible that the pricing survey results could serve to enhance this or any other message

_____

§ 2527 and noting that "if insurers paid the pharmacies dispensing fees closer to the amount paid by uninsured consumers, pharmacies would be more likely to continue to contract with insurers, and insured consumers would be able to have their prescriptions filled at the pharmacies of their choice").

[16]Indeed, most disclosure requirements, from nutritional facts on packaged foods to the financial details of publicly traded companies, are designed to remedy information asymmetries and potentially alter individuals' behavior as they become more well-informed market participants. As long as those who are compelled to disclose are not required to *endorse* the possible result of a better-informed market, just as the law schools in *FAIR* were not required to "endorse" the military's hiring policies, the fact that legislators may desire the resulting behavior is irrelevant. In such cases, the disclosing party is required only to provide the raw facts that others may use to make their own decisions.

related to pharmacy reimbursements; the content of the reported data can be known only after the studies are actually conducted. *See TDI Managed Care*, 449 F.3d at 1040 (noting the mere *possibility* that the information will improve reimbursement rates in the future). Simply put, PBMs remain free, in reporting survey results under § 2527, to assert any viewpoint they would like. They may encourage action or inaction on the basis of the statistics, or they may say that the report is worthless, sent only under government mandate. Because § 2527 does not alter or burden speech otherwise protected under the First Amendment, it is readily distinguishable from the compelled factual disclosures in *Riley*. The state appellate courts failed to appreciate this critical distinction.[17]

Defendants aver that the reasoning in *FAIR* is inapposite because the Solomon Amendment primarily regulates conduct, rather than speech. It is true that, in distinguishing its compelled speech precedent, the *FAIR* Court notes that "[t]he compelled speech to which the [plaintiffs] point is plainly incidental to the Solomon Amendment's regulation of conduct." 547 U.S. at 62. Nonetheless, *FAIR* analyzes whether the Solomon Amendment's compulsion of speech implicates

---

[17]The Supreme Court's recent decision in *Sorrell v. IMS Health Inc.*, ___ S.Ct. ___, 2011 WL 2472796 (2011), which struck down a Vermont law that *restricts* health care-related entities' dissemination of information, offers little guidance in the compelled speech context. Recognizing, nonetheless, that the underlying inquiry in any First Amendment case is whether the challenged regulation burdens protected speech, we note why *IMS Health* is entirely consistent with our holding. In that case, because the Vermont law restricted the ability of the regulated entities to disseminate and use the information for a particular purpose, the Court concluded that the statute "imposed a burden based on the content of speech and the identity of the speaker." *Id*. at * 8. As a content-based *restriction* on speech, therefore, the law in *IMS Health* placed a burden on protected expression and therefore required heightened constitutional scrutiny. *Id*. As discussed, § 2527 neither directly restricts nor results in the chilling of protected speech, and accordingly places no such burden on any expression. The absence of any such burden is what saves § 2527 from the Vermont law's fate.

the First Amendment by applying *Wooley* and *Barnette*, as a court would in any compelled speech case. *Id.* Its observation that the speech at issue was "incidental" to conduct, though perhaps further supportive of its conclusion, was evidently not dispositive as a matter of law.

Moreover, even if this part of *FAIR*'s reasoning was controlling, it applies similarly to the statute here. The primary prescription of § 2527 is conduct-based: it requires PBMs to conduct, or obtain the results of, pharmacy pricing studies. The statute also requires that the results of these studies, that is, a document containing the results of the performed conduct, be transmitted to a third party. This "compelled speech," or the transmission of the study results, is not the main thrust of the statute's requirement—this speech is required only as the method by which PBMs' clients are to become informed of the study mandated by the statute.[18] Therefore, even if we limit *FAIR*'s holding to statutes that primarily regulate conduct, it remains controlling as to § 2527.[19]

---

[18]Notably, Defendants do not allege that § 2527 is unconstitutional because it impermissibly regulates conduct.

[19]Consistent with the cases cited by the Dissent, we readily agree that the transmission of the pricing survey results constitutes speech. The § 2527-regulated conduct to which we refer, and that we believe is the statute's primarily regulatory effect, is the actual performance of the pricing studies, as distinguished from the transmission of their results. We fully accept that the transmission, even to the extent that it involves some conduct, constitutes speech. We also recognize that the performance of pricing surveys is not completely devoid of speech. Our point is simply that the § 2527 is effectuated primarily through conduct rather than through speech, just as, under *FAIR*, the Solomon Amendment's equal access requirement primarily regulates the schools' conduct, even while such conduct might inherently contain speech.

Moreover, the Dissent incorrectly asserts that to consider § 2527 "as conduct-based . . . is akin to considering the laws in *Wooley* and *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), as primarily regulating conduct because they require the physical display of a license plate and the tangible allocation of newspaper column inches." In *Wooley* and

**[11]** We hold that, under the applicable precedent, § 2527 does not offend the First Amendment by compelling speech that affects the content of the speaker's message. Therefore, we need not apply to it any level of constitutional scrutiny. *See Envtl. Def. Ctr., Inc., v. EPA*, 344 F.3d 832, 848-51 (9th Cir. 2003) (upholding an EPA regulation requiring storm sewer providers to distribute educational materials to the community about potential pollution, noting that this requirement involved no "compelled recitation of a message" and no "affirmation of belief" and was therefore a non-ideological public information mandate that did not impermissibly compel speech or offend the First Amendment).[20]

### 3.

The parties debate several other theories under which § 2527 could raise First Amendment concerns and thereby

---

*Tornillo*, the compulsion of speech was the obvious, central purpose of the laws in question. Any effect on conduct was simply a means to that end. Here, by contrast, the PBMs' transmission of survey results — the compelled speech in question — is the means to the statute's ultimate, conduct-based end: the reduction of information costs in the prescription drug market. The Dissent's formalistic reasoning misses the point of *FAIR*'s reasoning: the question is not whether speech is compelled at all, but whether that compulsion is the law's primary purpose or only "incidental" to the conduct-based purpose. *FAIR*, 547 U.S. at 62.

[20]Defendants argue that *Environmental Defense Center* and cases like it are inapposite because the disclosure requirements at issue there were part of a "comprehensive regulatory scheme." This argument misses the mark. In *Environmental Defense Center*, we did note that the disclosure requirements at issue were "consistent with the overall regulatory program of the Clean Water Act," 344 F.3d at 851, but this observation was separate from our First Amendment holding, which was explicitly based on our conclusion that the regulation did not "compel endorsement of political or ideological views" or impose "restraint on the freedom of any [regulated entity] to communicate any message to any audience." 344 F.3d at 850. *Environmental Defense Center*, therefore, serves as applicable precedent, and the district court correctly relied upon it.

require constitutional scrutiny. We discuss briefly why each theory is unavailing or inapplicable here.

**a.**

First, though they do not clearly raise the argument in their briefs, Defendants refer to a line of cases that concern forced accommodation of another's speech. The First Amendment limits the government's power to force individuals to accommodate a third party's message that would interfere with their own expression of ideas. *FAIR*, 547 U.S. at 63. Rather than looking at whether the challenger himself is being compelled to speak, forced accommodation cases consider whether a party is being made involuntarily to accommodate the expressive speech of another.

Forced accommodation was first considered in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 254-58 (1974). There, the Court held that a statute that required newspapers to print free of charge political candidates' replies to critical editorials violated the First Amendment because it forced newspapers to disseminate certain views, thereby exacting "a penalty on the basis of the content of a newspaper," and because it violated the newspaper's right to determine the content of the paper. *Id.* at 256-58; *see also Pac. Gas & Elec Co. v. Pub. Util. Comm'n of California*, 475 U.S. 1, 9-18 (1986) (holding that a state utilities commission could not require a utility company to include a third-party newsletter in its billing envelope because the utility company had "the right to be free from government restrictions that abridge its own rights in order to 'enhance the relative voice' of its opponents" (internal citation omitted)); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 566-70 (1995) (state law cannot require a parade to include a group whose message the parade's organizer does not wish to send because parades are "a [protected] form of expression, not just motion").

There is a considerable measure of overlap between the forced accommodation cases and the compelled speech analysis in *Riley*. Both focus on how the compulsion of speech or the compelled accommodation of another's speech effectively chills or frustrates the speaker's own ability to express his views pursuant to his First Amendment rights. *See FAIR*, 547 U.S. at 63 ("The compelled-speech violation in each of our prior [forced accommodation] cases . . . resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate.").

**[12]** Here, Defendants argue that § 2527 requires them to provide their clients with surveys that further the "compensation-enhancing goals" of the pharmacies, which are at odds with Defendants' own desired message to their clients that they provide the most cost-effective administration of any benefit program. Reports of pharmacy price surveys, however, "lack the expressive quality of a parade, a newsletter, or the editorial page of a newspaper," and, more importantly, do not "sufficiently interfere with any message" of the PBMs. *FAIR*, 547 U.S. at 64. Should the PBMs choose, they could report the pricing survey results while simultaneously or more vigorously advocating that their clients do nothing to change their pharmacy reimbursement rates or offer only the most cost-effective rates. In other words, § 2527 in no way chills or hampers PBMs' independent ability to speak their views on the subject of pharmacy reimbursements, even if these views are at direct odds with those of the pharmacies. Moreover, even if the reporting of objective data could be construed as advocacy for increases in pharmacy reimbursements, insurance companies "can appreciate the difference between" voluntary advocacy and statistical information that Defendants must convey because they are "legally required to do so." *Id.* at 65. And as in *FAIR*, there is little chance that the recipient of a report will mistakenly associate its contents with the PBM that sends it, when that PBM can so easily dissociate itself. *Id.*; *see also PruneYard Shopping Center v.*

*Robins*, 447 U.S. 74, 87-88 (1980). Defendants' forced accommodation argument is therefore unavailing.

**b.**

Defendants also argue that the court should invalidate § 2527 under *United States v. United Foods, Inc.*, 533 U.S. 405 (2001), in which the Supreme Court struck down a law mandating that fresh mushroom handlers pay fees used to fund advertisements promoting mushroom sales. Under *United Foods* and its predecessors, the First Amendment prevents the government in some instances from compelling individuals to pay subsidies for speech to which they object. 533 U.S. at 409-16; *see also Keller v. State Bar of California*, 496 U.S. 1 (1990); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977). The line of cases deals only with compelled funding, rather than compelled speech in the literal sense. *See United Foods*, 533 U.S. at 417 (Stevens, J., concurring) (noting that the regulation in *United Foods* was distinguishable from that in *Wooley* and *Barnette* because it did not compel speech itself, but rather the payment of money). *United Foods* reasons that the mushroom producers, who were not voluntarily collectivized, were being forced to fund the message to which they were opposed—that any mushroom is worth consuming regardless of its brand. 533 U.S. at 411. In striking down the law, *United Foods* is careful to distinguish *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457 (1997)—a case that upheld mandatory advertising contributions—noting that the requirements at issue there were incidental to a "valid scheme of economic regulation" in which "the producers were bound together and required by the statute to market their products according to cooperative rules" and had therefore already surrendered many individual liberties to a collective entity. 533 U.S. at 412. In the case of the mushroom law, by contrast, collective advertising was "the principal object of the regulatory scheme." *Id.*

**[13]** Here, Defendants challenge § 2527 for unconstitutionally compelling speech, not for compelling subsidies for commercial speech. And unlike the regulations at issue in the *United Foods* line of cases, § 2527 in no way requires Defendants to subsidize a particular message, let alone one to which they are principally opposed. While the reported data could, at some point, serve as the basis for political lobbying efforts, it does not inherently support one message or agenda over another. Therefore, to the extent that Defendants are expending resources to comply with § 2527's requirements, such expenditures are not analogous to the subsidies at issue in *United Foods*.[21]

### c.

The parties devote some portion of their briefs to discussing whether the speech compelled under § 2527 constitutes "commercial speech." Compelled "commercial speech" cases generally involve challenges to disclosure requirements designed to prevent deceptive consumer advertising. *See, e.g.*, *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985) ("The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading . . . ."); *see also United Foods*, 533 U.S. at 406 (distinguishing *Zauderer* because the regulation at issue was not "necessary to make voluntary advertisements non-misleading for consumers"). Accordingly, although these types of disclosure requirements implicate the First Amendment by potentially chilling the advertiser's protected commercial speech, *Zauderer*, 471 U.S. at 651, courts subject them to a lower

---

[21]Notably, as a matter of state law, the *ARP* decision expressly distinguishes *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), a compelled subsidy case that followed *United Foods*, and holds that it is inapposite because "the issue [before the court] is compelled speech by drug processors, not compelled subsidy of government speech." 42 Cal. Rptr. 3d at 262.

form of constitutional scrutiny resembling rational basis review. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1339-40 (2010) (noting that the "required disclosures [regarding debt relief assistance] are intended to combat the problem of inherently misleading commercial advertisements" and therefore applying *Zauderer* scrutiny); *Zauderer*, 471 U.S. at 650-51 (disclosure requirements on advertisers are lawful if "reasonably related to the state's interest in preventing deception of consumers"); *see also Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (financial disclosure requirements imposed on PBMs were designed to protect against questionable PBM business practices and, therefore, require only a *Zauderer* level of scrutiny akin to rational basis review); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113-16 (2d Cir. 2001) (because disclosure of "accurate, factual commercial information presents little risk that the state is forcing speakers to adopt disagreeable state-sanctioned positions" and furthers the First Amendment protection of "the free flow of accurate information," it requires less exacting scrutiny).

Though the disclosures mandated by § 2527 are similar to commercial disclosures in that they contain factual information related to commerce, Defendants and *ARP* correctly recognize that the disclosures required by § 2527 do not constitute commercial speech. *ARP*, 138 Cal. App. 4th at 1317. The Supreme Court has suggested that "commercial speech" is not merely "on a commercial subject" or "[p]urely factual matter of public interest." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761-62 (1976). Rather, commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557, 561 (1980). In summarizing federal commercial speech jurisprudence, the Supreme Court of California has noted that these cases generally involve "a speaker engaged in the sale or hire of products or services conveying a message to a person or persons likely

to want, and be willing to pay for, that product or service[,]" that is, speech related to a commercial transaction. *Kasky*, 27 Cal. 4th at 960.

**[14]** Section 2527 neither aims to reduce deceptive advertising to consumers nor compels disclosures in the context of a commercial transaction. Therefore, its requirements do not qualify as compelled "commercial speech" subject to a lower form of scrutiny. This conclusion, however, is of little significance in our analysis. Because the reporting requirements of § 2527 do nothing to compel or affect the content of *any* protected speech, commercial or otherwise, they are not subject to *any* form of First Amendment scrutiny.

**[15]** Pursuant to the foregoing analysis, we conclude that Defendants are not entitled to a judgment that § 2527 violates the First Amendment.

## C.   Article I, section 2 of the California Constitution

Finally, we must decide whether Defendants' motion should have been granted on the ground that the statute violates article I, section 2—the free speech provision—of the California Constitution. Because the California Supreme Court has not decided this question or one analogous to it, we must "predict how the highest state court would decide the issue," using any relevant material as guidance. *Vestar Dev.*, 249 F.3d at 960; *see also West*, 311 U.S. at 237; *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 186 (9th Cir. 1989) (the duty of the federal courts in a diversity case is to "predict how the state high court would resolve" the issue (internal citation and quotation marks omitted)).

**[16]** As we have held, the California Supreme Court would construe the state free speech provision as being coextensive with the First Amendment with respect to § 2527. Therefore, in accordance with our First Amendment analysis, we believe that California's highest court would hold that § 2527 is con-

stitutional under the California Constitution's free speech provision. We therefore hold the same.

We realize that, in so holding, we are creating a degree of disparity between the federal and state courts that could temporarily result in forum-shopping. Plaintiffs and others similarly situated may now sue in federal court to enforce what we have held to be a constitutional statute, while their ability to do so in state court remains subject to question. This is the unavoidable result of our faithful application of the "convincing evidence" standard under *Erie*.

As a practical matter, however, this concern is a minor one. *ARP*, *A.A.M. Health*, and *Bradley* were all decided in California's second appellate district. This is the only one of California's six appellate districts in which an erroneous interpretation of federal precedent on this issue operates as the current law. The other districts are not bound by that position and are free to resolve the question de novo. *See* 9 Witkin, Cal. Proc. 5th, Appeal, § 498 (2008) ("A decision of a Court of Appeal is not binding in the Courts of Appeal. One district or division may refuse to follow a prior decision of a different district or division . . . ."). We are confident that, in light of this opinion, California courts will henceforth apply federal precedent in the area of compelled speech as we have here, thereby alleviating any forum-shopping incentives.

If the Supreme Court of California eventually considers § 2527 and decides to construe the California free speech provision more broadly than the First Amendment in this context, then we will, of course, be bound by its decision. Our decision today is based on our analysis of First Amendment compelled speech precedent, or the body of law upon which *every single judge* to have opined on § 2527's constitutionality has relied. The California Supreme Court may choose to depart from that analysis; at this stage, however, we have no basis on which to believe that it would. Thus, as we are currently charged with predicting how the Supreme Court of California would

decide, we must conclude that § 2527 is constitutional under article I, section 2 of the California Constitution.

## III.

**[17]** Because the statute that Plaintiffs seek to enforce is constitutional under both the United States and California Constitutions, the district court's denial of Defendants' motions for judgment on the pleadings is hereby **AFFIRMED.**

WARDLAW, Circuit Judge, dissenting:

It has been more than seven decades since the Supreme Court ended the "mischievous" regime of *Swift v. Tyson*, 41 U.S. 1 (1842), in which federal courts sitting in diversity disregarded state court decisions and independently determined the meaning of state law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 74 (1938). The *Erie* doctrine has long required federal courts to "follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently." *Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467 (1940); *see also Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007). Today the panel majority returns us to the era of *Swift v. Tyson*, openly acknowledging that its opinion will lead to forum shopping and the inconsistent enforcement of state law, the very evils that the *Erie* Court sought to eradicate. *See Erie*, 304 U.S. at 74-78.

The majority disregards not one but three intermediate California appellate decisions holding that California Civil Code § 2527 violates Article I, section 2 of the California Constitution. *See ARP Pharmacy Servs., Inc. v. Gallagher Bassett Servs., Inc.*, 42 Cal. Rptr. 3d 256 (Cal. Ct. App. 2006); *A.A.M. Health Group, Inc. v. Argus Health Sys., Inc.*, No. B183468,

2007 WL 602968 (Cal. Ct. App. Feb 28, 2007); *Bradley v. First Health Servs. Corp.*, No. B185672, 2007 WL 602969 (Cal. Ct. App. Feb 28, 2007). It does so not because of any convincing evidence that the state high court would rule differently, but because it has convinced itself that its interpretation of federal constitutional law is correct, that the three panels of the Second District Court of Appeal got it wrong, and that the California Supreme Court would side with the views of two federal judges over the seven state appellate judges and two state trial judges who have all ruled to the contrary.

In point of fact, the California Supreme Court denied review of the last of the appellate court decisions, leaving the precedent intact. The failure to follow the intermediate state courts violates the *Erie* doctrine and offends important principles of federalism and comity. Even worse, however, it is the majority that fails to correctly apply First Amendment principles to fact-based expression, while endorsing unfettered government authority to compel "objective" speech. Not only am I not convinced that the California Supreme Court would utilize the majority's flawed analysis of the federal right of free speech to interpret the distinct, and more protective, state constitutional right, I find it highly doubtful. Therefore, I respectfully dissent.

## I.

We confront in § 2527 an unusual law without clear analogies in existing precedent. The statute requires drug claims processors to undertake or obtain studies about pharmacy pricing, summarize the results, and transmit the material to their clients. § 2527(c)-(d). Essentially, it requires Business A to speak about Business B to Business C. Unlike a disclosure law, it does not require that regulated entities divulge information about themselves to the public, but rather that they privately produce information about third parties to their clients. *Cf. Zauderer v. Office of Disciplinary Counsel of Supreme*

*Court of Ohio*, 471 U.S. 626, 651 (1985). Moreover, § 2527 is a stand-alone law that does nothing more than mandate speech. It is not ancillary to any comprehensive economic regulatory scheme. *Cf. United States v. United Foods, Inc.*, 533 U.S. 405, 411-12 (2001).

As our free speech jurisprudence treats "[e]ach method of communicating ideas [as] 'a law unto itself,' " so must it afford unique treatment to each different method of government mandated communication of ideas. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501 (1981) (adding that the "law must reflect the 'differing natures, values, abuses and dangers' of each method") (quoting *Kovacs v. Cooper*, 336 U.S. 77, 97 (1949)); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.' ") (quoting *Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)). The parties have not identified any case that squarely controls the federal or state constitutional analysis of this unique brand of government mandated private speech about third parties.

The California Constitution provides that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const. art. 1 § 2. This clause "enjoys existence and force independent of the First Amendment" of the United States Constitution. *Gerawan Farming, Inc. v. Lyons*, 12 P.3d 720, 734 (Cal. 2000). Indeed, "the California liberty of speech clause is broader and more protective than the free speech clause of the First Amendment." *Los Angeles Alliance for Survival v. City of Los Angeles*, 993 P.2d 334, 342 (Cal. 2000); *see also Kasky v. Nike, Inc.*, 45 P.3d 243, 255 (Cal. 2002). Therefore, we should be especially hesitant to tell the

California courts how to apply their own Constitution to such a unique and unprecedented state law mandating speech.[1]

## II.

The majority identifies two "critical errors" in the Court of Appeal panel decisions that it believes the California Supreme Court would not make: giving insufficient weight to *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("*FAIR*"), and misinterpreting *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988). However, the California Court of Appeal panels reasonably interpreted both cases, and thus there is no convincing reason to believe that the California Supreme Court would rule differently.

In *FAIR*, the Court rejected a First Amendment challenge to the Solomon Amendment, a statute restricting federal funding to universities that do not grant military recruiters comparable access to other employers looking to hire at their law schools. 547 U.S. at 52-53. The Court recognized that the "recruiting assistance provided by the schools often includes elements of speech" as "schools may send e-mails or post notices on bulletin boards on an employer's behalf." *Id.* at 61-62. However, the Court concluded that this marginal compulsion of speech did not violate the constitution. The majority analogizes the pricing reports from § 2527 to the hypothetical e-

---

[1]The case law relied on by the majority illustrates the dangers of disregarding state court decisions and imposing our own interpretations of legal gray areas. The first case cited by the majority for the proposition that we can refuse to follow intermediate state appellate decisions that make "analytical errors" is *Briceno v. Scribner*, 555 F.3d 1069 (9th Cir. 2009). There a divided panel of our court declined to follow two California Court of Appeal decisions interpreting a gang sentencing enhancement statute. *Id.* at 1080-82. However, the California Supreme Court subsequently disagreed with the *Briceno* majority, concluding that the Court of Appeal panels did not erroneously interpret state law. *People v. Albillar*, 244 P.3d 1062, 1074-75 (Cal. 2010).

mails and bulletin board postings in *FAIR*, and holds that because of its factual nature, such compelled speech does not give rise to First Amendment scrutiny. This dramatically overstates the holding of *FAIR*, as the Supreme Court specifically acknowledged that "these compelled statements of fact . . . are subject to First Amendment scrutiny." *Id.* at 62.

The *FAIR* Court did not find a constitutional violation because the particular factual statements at issue were both hypothetical and ancillary to a comprehensive regulatory regime. The Court determined that the e-mails and bulletin board postings would only be " 'compelled' if, and to the extent, the school provides such speech for other recruiters," and that such compulsion would be "plainly incidental to the Solomon Amendment's regulation of conduct." *Id.* That stands in stark contrast to § 2527, where the compulsion is not contingent on any voluntary conduct by the regulated party, and where it is not ancillary to any comprehensive regulatory scheme. Rather, § 2527 is a direct, stand-alone government mandate of speech. Therefore, the Court of Appeal panels' treatment of *FAIR* in this context was not erroneous, and it does not provide convincing evidence that the California Supreme Court would rule differently.[2]

---

[2]The majority's suggestion that § 2527 may primarily regulate conduct because it requires the compiling and transmission of a document, is contrary to explicit Supreme Court precedent. *See Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("It is true that the delivery of a tape recording might be regarded as conduct, but given that the purpose of such a delivery is to provide the recipient with the text of recorded statements, it is like the delivery of a handbill or a pamphlet, and as such, it is the kind of 'speech' that the First Amendment protects."). All government compulsion of speech requires some conduct incident to the expression. Labeling § 2527 as conduct-based on this ground is akin to considering the laws in *Wooley* and *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) as primarily regulating conduct because they require the physical display of a license plate and the tangible allocation of newspaper column inches. The majority's attempt to distinguish "the actual performance of the pricing studies" from "the transmission of their results" is unavailing, as both "the

As for *Riley*, the Court of Appeal decisions relied on the case for the proposition that § 2527 warrants constitutional scrutiny even though it compels "essentially statistical information." *ARP*, 42 Cal. Rptr. 3d at 261. The majority argues that *Riley* stands for the narrower proposition that mandated factual speech only warrants scrutiny if the law has a direct chilling effect on other protected First Amendment speech. However, this confuses the initial inquiry into whether a regulation even implicates the First Amendment with the separate inquiry into whether it survives constitutional scrutiny.

The *Riley* Court first held quite broadly that "mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech." 487 U.S. at 795. The Court thus established that the compulsion of factual speech triggered First Amendment analysis before even considering whether the regulation burdened other protected expression. Only then did the *Riley* Court proceed to discuss *Wooley* and *Barnette*, and the broader question of whether the regulation burdened other protected speech, as part of the separate and subsequent inquiries into the precise level of scrutiny to apply and whether the regulation was sufficiently tailored to fit the state interest. *Id*. at 797-99.

In other words, the *Riley* Court held that the particular law compelling speech failed exacting scrutiny because of its

creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health*, 564 U.S. ___, Slip Op. at 15, 2011 WL 2472796 at *12 (June 23, 2011); *see also Brown v. Entm't Merch. Ass'n*, 564 U.S.___, Slip Op. at 4 n.1, 2011 WL 2518809 at *4 (June 27, 2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference."). Finally, the majority asserts that § 2527's compulsion of speech is merely ancillary to the legislature's ultimate goal of reducing information costs. However, the majority contradicts itself, for elsewhere it correctly notes that the statute's purpose "is of limited significance." What matters is the effect of the statute on speech, and just as in *Wooley* and *Tornillo*, the sole tangible directive of this regulation is the compulsion of speech.

chilling effect; it did not hold that a chilling effect is a prerequisite to any First Amendment scrutiny at all. The *FAIR* Court made this clear when it cited *Riley* for the proposition that "compelled statements of fact ('The U.S. Army recruiter will meet interested students in Room 123 at 11 a.m.'), like compelled statements of opinion, are subject to First Amendment scrutiny." 547 U.S. at 62. The *FAIR* Court made no mention of a chill requirement, and indeed it suggested that the potential compulsion of e-mails and bulletin board postings would draw constitutional scrutiny despite the nature of the content. *Id.*

In faulting the California courts for relying on *Riley*'s holding about factual speech, the majority makes the stunning assertion that § 2527 is not subject to any First Amendment scrutiny because it requires only the dissemination of "objective" data, and "Defendants are not compelled to convey a viewpoint or perform any subjective analysis of the numbers they report." No authority is cited for the proposition that compelled speech must contain subjective analysis or overt opinion in order to implicate constitutional rights. Indeed, it is well established that "the First Amendment's proscription of compelled speech does not turn on the ideological content of the message that the speaker is being forced to carry. The constitutional harm — and what the First Amendment prohibits — is being forced to speak rather than to remain silent." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004).

The majority's narrow interpretation of the First Amendment contradicts decades of Supreme Court precedent extending constitutional protection to communications containing truthful information. For instance, the majority's reasoning fails to account for fact-based news reporting, which is considered protected speech under both the First Amendment and the California Constitution. *See, e.g., Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 44 Cal. Rptr. 2d 46, 51 (Cal. Ct. App. 1995) (explaining that it is a "faulty premise . . . that

news reporting activity cannot be characterized as 'free speech.' In fact, courts have consistently described such activity as 'free speech.' ") (citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775-776 (1986), *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952), and *Daily Herald Co. v. Munro*, 838 F.2d 380, 384 (9th Cir. 1988)); *see also Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("[S]tate action to punish the publication of truthful information seldom can satisfy constitutional standards.") (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979)). Moreover, the Supreme Court has extended First Amendment protection to numerous forms of speech that communicate nothing but factual information. *See, e.g., Linmark Associates, Inc. v. Willingboro Township*, 431 U.S. 85, 96 (1977) (striking an ordinance prohibiting the display of "For Sale" and "Sold" signs in front of houses); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976) (extending First Amendment protection to the communication of product price information).

Most recently, in *Sorrell v. IMS Health*, 564 U.S. ___, 2011 WL 2472796 (June 23, 2011), the Supreme Court applied heightened First Amendment scrutiny to a Vermont statute that restricts how certain entities can use medical prescription information. The Court approvingly quoted the Second Circuit, which had held that the "First Amendment protects even dry information, devoid of advocacy, political relevance, or artistic expression." *IMS Health*, Slip Op. at 14, 2011 WL 2472796 at *11 (quoting *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 271-72 (2d Cir. 2010)). The Vermont law in *IMS Health* is the flip side of California's § 2527; they involve similar speech that Vermont prohibits and California compels.

The majority asserts that the compulsion of factual speech is "quite different from" the prohibition of such speech, but in fact, "in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily compris-

ing the decision of both what to say and what not to say." *Riley*, 487 U.S. at 796. As the First Amendment protects the "concomitant" rights to speak and refrain from speaking, it follows that § 2527 does not avoid all constitutional scrutiny merely because it mandates factual speech. *Wooley*, 405 U.S. at 714. Facts, including statistics, convey messages. *See IMS Health*, Slip Op. at 15, 2011 WL 2472796 at *12 ("Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs."). The record in this case clearly "suggests that the governmental purpose in enacting section 2527 was to urge third party payors, by the use of statistical information, to compensate pharmacists at a fairer rate for providing pharmaceutical services to their insureds." *ARP*, 42 Cal. Rptr. 3d at 265. The California Court of Appeal panels properly applied the holding of *Riley* to this scenario in which the Defendants complain that § 2527 compels them to disseminate a message with which they disagree. Nothing about these decisions provides convincing evidence that the California Supreme Court would decide the question differently.

## III.

"[W]here there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001). "This is especially true when the Supreme Court has refused to review the lower court's decision." *See State Farm Fire & Cas. Co. v. Abraio*, 874 F.2d 619, 621 (9th Cir. 1989). The majority gives insufficient weight to the California Supreme Court's denial of review here, relying on an inapposite citation about the meaning of the denial of a certification request from this court. *See In re K F Dairies, Inc. & Affiliates*, 224 F.3d 922, 925 n.3 (9th Cir. 2000). Here, in the context of the *Erie* doctrine, denial of review by a state high court is an appropriate and

important factor to consider. *See Tenneco West, Inc. v. Marathon Oil Co.*, 756 F.2d 769, 771 (9th Cir. 1985).

The district court issued its ruling in this case on May 15, 2007, after the three California Court of Appeal panels had rendered their judgments that § 2527 violates the state constitution. However, in opting not to afford *Erie* deference to those judgments, the district court did not have the benefit of the California Supreme Court's decision to deny review of *Bradley*, which occurred on June 13, 2007. *See Bradley*, 2007 Cal. LEXIS 6365. The panel majority is at no such disadvantage, but it still substitutes its own analysis for that of every state court to consider this matter.[3]

Two important "aims of the *Erie* rule [are] discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Kohlrautz v. Oilmen Participation Corp.*, 441 F.3d 827, 831 (9th Cir. 2006) (quoting *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 428 (1996)). As the majority acknowledges, its opinion will encourage forum shopping by creating a disparity in the administration of California law. The proffered justification for this unfortunate result is that the three California Court of Appeal panels made critical analytical errors in holding that § 2527 violates the state constitution, but in fact they properly interpreted the relevant state and federal law, and there is no convincing evidence that the California Supreme Court would rule differently. As this is a classic case requiring deference to state court judgments about a state law matter, I would reverse the decision of the district court.

---

[3]That the California Supreme Court denied review in *Bradley*, leaving state precedent intact in the face of a contrary federal district court holding, only further indicates that the intermediate state appellate courts correctly applied state law, and certainly does not count as convincing evidence that the California Supreme Court would uphold the statute.